PORTO RICO TELEPHONE COMPANY, Petitioner, *v.* TAX COURT, Respondent; SOL LUIS DESCARTES, Secretary of the Treasury, Intervener.

Nos. 295, 296 and 297. Resubmitted October 13, 1959.
—Decided June 30, 1960.

---

*Franceschi & Sifre* for petitioner. *Hiram R. Cancio, Secretary of Justice; (B. Fernández Badillo,* former Acting Secretary of Justice and *J. C. Santiago Matos,* Assistant Attorney General, on the brief) for intervener.

MR. JUSTICE SERRANO GEYLS delivered the opinion of the Court.

In this proceeding the petitioner, Porto Rico Telephone Co., challenges the constitutionality of § 2 of Act No. 301 of May 15, 1945 (Sess. Laws, p. 1146; 27 L.P.R.A. § 342), which provides as follows:

"The Secretary of the Treasury is hereby authorized and directed to levy and collect a tax of 2 per cent on the gross operating revenue collected by any public-service company or governmental instrumentality of the Commonwealth of Puerto Rico for the transmission of telephone or telegraph messages, including telegraphic money orders. All sums received by the Secretary of the Treasury pursuant to the provisions of this section shall be deposited by him in a special fund to be known as the Special Fund for Communications Development. Said fund shall be made available from time to time upon request of the Governing Board of the Puerto Rico Communications Authority for expenditure by said Board, or under its direction, for such improvements, extensions, research, experiments and special investigations as it may deem desirable for the purpose of extending and improving the quality of telephone and telegraphic communications facilities and systems in Puerto Rico. Said tax shall be paid by the public-service companies or the public instrumentalities which render said service within sixty (60) days after an accounting for the fiscal year has been made; and shall not in any manner charge the amount of said tax to the persons who use their services."

The petitioner filed an action for refund in the former Tax Court, which was denied upholding the validity of the provision assailed. In its elaborate and able opinion, the trial court found proved certain facts which should be set forth before analyzing the legal problems. They are as follows:

In the years to which the suit refers there existed, and still exist, in Puerto Rico, two organizations: a governmental and a private concern, both engaged in rendering telephone services. The former is named Puerto Rico Communications Authority and serves the city of Caguas and nine other neighboring towns. It also administers a telegraphic system which covers the whole island. The latter petitioner herein, operates under the name of Porto Rico Telephone Company and renders service in the whole island, except the area covered by the Authority. The telephone systems of the two organizations are interconnected by long distance lines. The Public Service Commission regulates petitioner's services and rates but not those of the Authority. The latter has complete freedom to fix its prices.

Both the Porto Rico Telephone Company and the Authority have paid the tax imposed by Act No. 301.[1] During the years 1945, 1946, and 1947 the Authority requested and obtained money from the special fund created by that Act "and with said money . . . has improved the quality of the telephone service in the area served thereby, substituting an old and useless system received from the Telegraph Bureau of the Insular Government by another new one, aside from having increased and extended its original capacity, mainly the telephone system to Vieques and Culebra." The Authority has received from the special fund larger sums than those it has paid thereto, but most of the funds used in said improvements have been appropriated from general funds by the Legislature. The Authority has not used any part of those funds for "direct improvements" in petitioner's system. The latter "benefits indirectly from the improvements made by the Authority, that is, through the interconnection or unification of both services. The improvement

---

[1] The petitioner paid $18,850.59 in 1945; $34,693.88 in 1946, and $38,246.93 in 1947. The Authority paid $6,000 in 1945 and about $8,000 in the other years.

of the services of the Authority has resulted in benefit for both entities due to said interconnection."

"The Authority has substituted the system acquired by a new automatic and more efficient system in all the towns served thereby. Telephone communications in the island have been extended to Vieques and Culebra and the quality of the service has improved." Until 1947 there had been an increase of 340 per cent in the number of subscribers to the Authority. "The improvements made by the Authority in its telephone system have benefited the public in general, including the petitioner's subscribers; and they benefit the government."

Between the years 1945 and 1947 the Porto Rico Telephone Company neither requested nor obtained from the Public Service Commission an increase in its rates. In 1948 it applied for an increase which it later withdrew and subsequently made another one in 1949. On the following year the Commission authorized an increase.

"The petitioner's operating net profits in 1944 were $67,214; in 1945, $121,881; in 1946, $277,509; and in 1947, $281,019. Based on the investment and the plant, the aforesaid net profits represent 2.4 per cent in 1944, 2.61 per cent in 1945, 4.39 per cent in 1946, and 4.10 per cent in 1947." Both the income tax and the special tax of 2 per cent of Act No. 301 were taken into consideration in computing said profits. In granting the temporary increase in 1950, the Public Service Commission did so on the basis of the minimum of 5 per cent profit authorized by Act No. 12 of April 9, 1941 (Sess. Laws, p. 342). The increase in petitioner's gross income during the aforesaid years was due (1) to the increase in the number of telephones and (2) to the development of long distance service.

During the years prior to 1948 the petitioner's operating expenses increased constantly. One of the main causes was the raise in wages and other concessions to the workers which

resulted in an expense of more than one and one half million dollars from 1943 to 1948. "The additional expense caused by the 2 per cent tax was not what prompted the petitioner to apply to the Public Service Commission for an increase in its rates."

In view of that Act and those facts, petitioner adduces the following grounds in support of its petition of unconstitutionality: (1) The Act challenged here violates § 3 of the Organic Act of Puerto Rico because the tax levied is not "for the purposes of the insular and municipal governments." (2) The Act leaves the investment of the tax to the fancy of the Communications Authority and constitutes, therefore, an undue delegation of legislative powers. (3) The tax constitutes an exaction of the petitioner's property, under the guise of taxing power. (4) The Act violates the uniformity rule and deprives the petitioner of its property without due process of law. (5) The Act is void because it prohibits passing the tax to the consumer. We shall analyze each one of those contentions separately.

I. *"Purposes of the insular and municipal governments."*

■ Section 3 of the Organic Act, in effect in the years mentioned in this suit,[2] provides that "taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges and concessions may be imposed *for the purposes of the insular and municipal governments, respectively*, as may be provided and defined by the Legislature of Puerto Rico." (Italics ours.)

In the light of that provision, the petitioner briefly alleges that the phrase "for the purposes of the insular and municipal governments" is not equivalent to the phrase "for a public purpose" which defines the power of taxation as part

[2] This provision is still in effect as part of the "Puerto Rican Federal Relations Act." 64 Stat. 320.

of due process of law;[3] that "a tax is an exaction for the support of the government and of those services which are a logical and natural governmental function"; that the improvement of telecommunications is not a "governmental purpose"; and that the Communications Authority is not a part of the government nor exercises a governmental function.

In support of its strict interpretation of the phrase "for the purposes of the insular and municipal governments" the petitioner cites parts of judicial opinions which discuss the well-known doctrines of intergovernmental immunity between the federal and state governments and immunity of the municipalities for damages caused in the exercise of their "governmental" functions as distinguished from their "proprietary" functions.[4] Irrespective of the fact that the strength of both doctrines has long dwindled, there is no

---

[3] Some states also expressly require by constitutional provision that the taxes be for "a public purpose." McAllister, *Public Purpose in Taxation*, 18 Cal. L. Rev. 137, 138 (1929). Section 9 of Art. VI of the Constitution of the Commonwealth of Puerto Rico, effective since 1952, provides that: "Public property and funds shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law."

[4] Aside from the afore-mentioned case law, the petitioner relies on two other lines of precedent. It cites, on the one hand, decisions rendered by some American courts at the beginning of the second half of the nineteenth century when a very narrow concept of governmental functions prevailed and consequently, of what constituted a "public purpose." The following belong to this class: *Lowell* v. *City of Boston*, 15 Am. Rep. 39 (1873)—a city cannot issue bonds to make loans to persons whose homes were destroyed by fire; *Weimer* v. *Village of Douglas*, 21 Am. Rep. 586 (1876)—a municipality cannot issue bonds to buy stock in a corporation for the purpose of inducing it to establish itself in said municipality; *Loan Association* v. *Topeka*, 87 U.S. 655 (1875)—a city cannot issue bonds to aid manufacturing companies to establish themselves in the city. As will be shown hereafter in this opinion, the holdings of those cases have been abandoned for several decades and their actual value is mainly historical. On the other hand, the petitioner cites decisions—*State, City of Reno* v. *Boyd*, 74 Pac. 654 (1903); *State* v. *Lafayette Tire Ins. Co.*, 63 So. 630 (1913); *Peterson* v. *Hancock*, 54 N.W. 2d 85 (1952)—which decree the nullity of a tax levied by a city or district for the benefit of other districts or cities. That case law is based on the strong tradition

doubt that they are clearly inapplicable to the circumstances of this case. The former seeks to protect the stability of the American federal system and the autonomy of its components, and bars the national government and the states from the mutual levying of taxes which would weaken or destroy their functions. That doctrine encountered great hardships and many of the points raised by its initial application have been corrected in recent years. *Phillips Chemical Co.* v. *Dumas School District*, 4 L. Ed. 2d 384 (1960); *United States* v. *City of Detroit*, 355 U.S. 466 (1958); *United States* v. *Township of Muskegon*, 355 U.S. 484 (1958); *City of Detroit* v. *Murray Corp.*, 355 U.S. 489 (1958); Powell, *The Waning of Intergovernmental Tax Immunities*, 58 Harv. L. Rev. 633 (1945). The latter doctrine constitutes one of the means by which the courts attempted to mitigate the harsh effects of the doctrine of sovereign immunity in the field of torts. To that effect the municipal functions were divided into "governmental" and "proprietary," it having been decided that when the municipalities exercised the latter there were no good reasons to confront the injured parties with the doctrine of immunity. *Government of the Capital* v. *Executive Council*, 63 P.R.R. 417, 420–22 (1944); *Serra* v. *Transportation Authority*, 67 P.R.R. 574 (1947); *Rodríguez* v. *People*, 75 P.R.R. 377,

---

of municipal autonomy which exists in the United States, and on its facts, it has no application whatever to the problem at bar.

The petitioner also repeatedly relies on *United States* v. *Butler*, 297 U. S. 1 (1936), which decided that a tax laid by Congress was unconstitutional because its product was going to be used, not for a private purpose, but as part of a plan for regulating agriculture which the Federal Supreme Court considered as beyond the powers delegated to the federal government by the Constitution. Aside from the fact that this last determination in *Butler* has been definitively rejected—*Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U.S. 381 (1940) *Wickard* v. *Filburn*, 317 U.S. 111 (1942)—we are not confronted in the case at bar with the problem of whether the product of the tax will be used in support of a regulatory plan beyond the powers of the Puerto Rican government, but simply whether or not said tax is for a "public purpose," an issue which the Court expressly bypassed in *Butler.* 297 U.S. 68.

386 (1953); Symposium—*Governmental Tort Liability*, 9 L. & Contemp. Prob. 179–370 (1942); *Municipal Corporations—Sovereign Immunity*, 11 Vand. L. Rev. 253 (1957).

It is evident that those distinctions stem from juridical and social circumstances far afield in the problem before us. The petitioner does not present nor have we been able to find cogent reasons warranting its use as a measure of the powers of taxation and expenditure of public funds which Congress delegated to the Legislature of Puerto Rico. There is no question that we would need much more than those meager analogies to subjugate governmental authority to the narrow concepts submitted by the petitioner. *Cf. Puget Sound Co.* v. *Seattle*, 291 U.S. 619, 623–626 (1934).

■■ It is indispensable, therefore, to resort to other sources. The legislative history of the Organic Act—53 Cong. Rec., Parts 6–9; 64th Cong., H. R. Rep. No. 77 and S. Rep. No. 579—contains no specific expression whatever on the aforesaid phrase of § 3. It shows palpably, however, that Congress intended to confer upon the Government of Puerto Rico powers similar to those possessed by the states of the Union.

On several occasions, the Federal Supreme Court has reiterated that rule of construction. It said in *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 261–262 (1937):

"The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories. The effect was to confer upon the territory many of the attributes of *quasi*-sovereignty possessed by the states—as, for example, immunity from suit without their consent. By those acts, the typical American governmental structure, consisting of the three independent departments—legislative, executive and judicial—was erected. 'A body politic'—a commonwealth—was created. The power of taxation, the power to enact and enforce laws, and other

characteristically governmental powers were vested. And so far as local matters are concerned, as we have already shown in respect of the continental territories, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures." (Citations eliminated.) See, also, *Puerto Rico* v. *Rubert Co.*, 309 U.S. 543, 547 (1940); *cf. De Castro* v. *Board of Commissioners*, 322 U.S. 451 (1944); *Bonet* v. *Yabucoa Sugar Co.*, 306 U.S. 505 (1939); *Bonet* v. *Texas Co.*, 308 U.S. 463 (1940); *Domenech* v. *National City Bank*, 294 U.S. 199 (1935).

It seems absurd to accept that such was not the legislative intent when dealing with a power of such vastness and vital importance as the taxing power. Surely, Congress intended to grant that power to the Puerto Rican government,[5] subject to the general rule of "public purpose" which limits constitutionally both the federal [6] and the state governments. There is no reason to believe that it sought to encase the Puerto Rican government so as to preclude it from expending public funds in activities which for several decades have been commonplace in federal and state experience.[6a] A legal instrument defining the powers of a government cannot be interpreted in such parochial fashion.

---

[5] The limitation under analysis was incorporated into the Organic Acts of other territories by the use of identical or very similar words. Virgin Islands—48 U.S.C. § 1406i; Guam—48 U.S.C. § 1423a; Philippine Islands—39 Stat. 548; Alaska—48 U.S.C. § 79.

[6] The limitation is imposed on Congress by way of the "general welfare" clause—Art. I, § 8, Cl. 1 of the Constitution of the United States—and on the states by the "due process" clause of the Fourteenth Amendment. The applicable principles, however, are similar.

[6a] Other provisions of the two Organic Acts clarify the Congressional intent. Foraker: § 4—all the money collected in Puerto Rico for duties and taxes prior to the effectiveness of the Act, shall be paid into the treasury of Puerto Rico "to be expended as required by law for the government and benefit thereof"; § 12—directs the Treasurer to pay from local revenues "all expenses and obligations contracted for the internal improvement or development of the island"; § 38—where necessary to anticipate taxes and revenues, bonds may be issued "to provide for expenditures authorized by law, and to protect the public credit, and to reimburse the United States for any moneys which have been or may

More than half a century [7] of governmental practice confirms the purpose of Congress. From 1900 to 1952, and particularly in the last decade of that period, the Legislative Assembly of Puerto Rico authorized taxes and expenditures for the myriad of purposes [8] that modern governments are compelled to pursue. The pertinent laws were signed by presidentially-appointed governors and reported to Congress pursuant to the provisions of § 23 of the Organic Act, and not once have any of them been disapproved or the local power to approve them put in doubt. In 1950 Congress, obviously familiar with the economic development of Puerto Rico and the active intervention of its government in economic processes, frequently by engaging in activities of industrial and commercial nature, maintained, with the approval of the Puerto Rican voters, identical limitation in the "Puerto Rican Federal Relations Act." We conclude, in the light of

---

be expended out of the emergency fund of the War Department for the relief of the industrial conditions of Puerto Rico caused by the hurricane. . . ." Organic Act (Jones) of 1917: § 6—directs the Treasurer to pay from insular revenues—"all expenses and obligations contracted for the internal improvement or development of the island"; § 18—"That the Commissioner of Agriculture and Commerce shall have general charge of such bureaus and branches of government as have been or shall be legally constituted for the study, advancement, and benefit of agriculture, commerce and other industries."

[7] The limitation in question was originally incorporated into § 38 of the Foraker Act of 1900. We have examined Vol. 33, Part 4 of the Congressional Record (1900) and Senate Report No. 249, Congress No. 56, submitted by Senator Foraker, and we have found no explanation to the said provision. It has not been possible to use other sources of the legislative history of the two Organic Acts.

[8] It would be tedious and completely unnecessary to enumerate all the Acts supporting this statement. Suffice it to state that from the beginning of the century to the years mentioned in the present suit, the Puerto Rican government, aside from discharging its classical functions, has appropriated funds for numerous others. A haphazard search shows that the insular government levied taxes and apportioned money for the sale of electricity, water for irrigation, and dock facilities and services, and the municipalities for acqueducts, electric plants and also some for docks. Agricultural and livestock activity was developed by various means —subsidies, schools, experimental stations, campaigns against diseases, fairs, expositions, advertisements, etc.—there having been established for

the logical and ordinary meaning of the words used, of the vital importance of governmental power, of the Congressional intent to confer upon Puerto Rico governmental powers similar to those of a state, and of the invariable practice of more than half a century, that the phrase "for the purposes of the insular and municipal governments" of § 3 of the Organic Act does not have a narrower meaning than the phrase "for a public purpose," restrictive of Congressional and state powers. We thus reaffirm what we had impliedly decided in *Márquez & Co.* v. *Sancho, Treas.*, 57 P.R.R. 312 (1940). *Cf. P. R. Distilling Co.* v. *Treasurer*, 52 P.R.R. 651, 657 (1938); *P. R. Tobacco Corp.* v. *Buscaglia, Treas.*, 62 P.R.R. 782, 800 (1944).

 Accordingly, we now turn to consider whether the legislative purposes expressed in § 2 of Act No. 301 —"expenditure . . . for . . . improvements, extensions, research, experiments and special investigations . . . for the purpose of extending and improving the quality of telephone and telegraphic communications facilities and systems in Puerto Rico"—constitute a public purpose."[9] Before we decide this specific problem it is imperative, however, to mention some underlying principles.

---

such purpose numerous separate funds which were maintained by special taxes or other sources. The industry also received aid although to a lesser extent. Laws were also provided for low-cost housing programs, varied services for the poverty-stricken classes and cultural development activities. As is known, these activities were heightened as of 1941 and others were added. The government appropriated substantial sums for economic development and participated directly in the ownership and administration of agricultural, industrial and commercial enterprises. For some examples, see the following volumes and pages of the Acts of Puerto Rico: 1903–35, 49; 1911–82, 157; 1912–80; 1913–146; 1914–158, 227; 1917–368; 1917 II–292; 1919–349; 1921–90; 1925–326; 1930–130; 1934–216, 272; 1936–542; 1937–221, 225, 233; 1938–186, 281, 396, 492; 1939–714; 1940–324, 726, 1144; 1941–388, 684, 762, 862, 934, 944; 1942–570, 710, 934, 1064, 1364; 1945–330, 1064.

[9] Regarding what constitutes a "public purpose" see, in general, Judson, *Public Purposes for Which Taxation is Justifiable*, 17 Yale L. J. 162 (1908); McAllister, *op. cit. supra*; Bergman, *The Federal Power to Tax and to Spend*, 31 Minn. L. Rev., 328 (1947).

*First:* Considered alone, the tax challenged here is perfectly valid. The objection set forth stems from the fact that the Act which imposes it at the same time diverts it to a specific purpose, instead of ordering its payment into government funds. That circumstance grants to whomever pays it a special standing to challenge the constitutionality of the expenditure, and consequently of the tax, which otherwise and as part of the general mass of taxpayers it would not have. *United States* v. *Butler,* 297 U.S. 1, 57–58 (1936); *Massachusetts* v. *Mellon,* 262 U.S. 447 (1923); *Suárez* v. *Tugwell, Governor,* 67 P.R.R. 166 (1947); *Cafeteros de Puerto Rico* v. *Treasurer,* 74 P.R.R. 704 (1953). "But if the tax, *qua* tax, be good . . . and the purpose specified be one which would sustain a subsequent and separate appropriation made out of the general funds of the Treasury, neither is made invalid by being bound to the other in the same act of legislation. The only concern which we have in that aspect of the matter is to determine whether the purpose specified is one for which Congress can make an appropriation without violating the fundamental law. If Congress, for reasons deemed by it to be satisfactory, chose to adopt the quantum of receipts from this particular tax as the measure of the appropriation, we perceive no valid bases for challenging its power to do so." *Cincinnati Soap Co.* v. *United States,* 301 U.S. 308, 313 (1937); Bergman, *op. cit. supra* at 350–353.

*Second:* The judicial function of reviewing legislative determinations as to what constitutes a "public purpose" in taxation is extremely limited.[10] To the usual tests of self-restraint which guide the "grave and delicate [judicial] function" of passing upon the constitutional validity of legislative measures—*Commonwealth* v. *Aguayo,* 80 P.R.R. 534,

---

[10] As to the scope of the judicial function in reviewing what constitutes a "public use" in condemnation of private property, see *Berman* v. *Parker,* 348 U.S. 26 (1954); *Commonwealth* v. *Heirs of Gautier,* 81 P.R.R. 565 (1959).

576 (1958)—we add in this case the special fact that the determination of the legislature relies on varied elements of public policy, the scrutiny of which is beyond the competence of judges. The approval of a tax measure requires the careful study of difficult political, social and administrative problems, and above all, the weighing of the economic effect of the new tax on consumption, expenditures, production, employment, income and savings. The repeated reluctance of the courts to intervene actively in this matter is thus explained.

The Federal Supreme Court has repeatedly fixed the scope of judicial investigations in this area. In *Carmichael* v. *Southern Coal Co.*, 301 U.S. 495, 514–515 (1937), the Court explained that since the adoption of the Fourteenth Amendment the state taxing power can be exerted only to effect a public purpose and not for private purposes but that the requirements of due process leave "free scope for the exercise of wide legislative discretion in determining what expenditures will serve the public interest." That discretion embraces, of course, expenditures for the "general welfare." "The modes of advancing the public interest . . . are peculiarly within the knowledge of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods." Accordingly, to warrant the intervention of a court it is necessary to have "a plain case of departure from every public purpose which could reasonably be conceived," or, as was said in *Helvering* v. *Davis*, 301 U.S. 619, 640 (1937), "a display of arbitrary power, not an exercise of judgment." And that judicial authority, it was added in *Everson* v. *Board of Education*, 330 U.S. 1, 6 (1947), must be exercised with the "most extreme caution." See, also, *United States* v. *Butler, supra,* at 67; *Magnano* v. *Hamilton*, 292 U.S. 40–44 (1934); *Milheim* v. *Moffat Tunnel District*, 262 U.S. 710, 717 (1923); *Green* v. *Frazier*, 253 U.S. 233, 239 (1920).

*Third:* The concept of "public purpose" is not static, bound forever to the ideas which at a particular historical time defined the powers and responsibilities of the government. It is, on the contrary, indissolubly interwoven with the general welfare and, like the latter, must conform to the ever-changing social conditions of a specific community and the peculiar problems created by them, and to the new obligations imposed by the citizens on its government in a highly complex democratic society. *Helvering* v. *Davis, supra* at 641. It is well to recall that "the Fourteenth Amendment did not strip the states of their power to meet problems previously left for individual solution." *Everson* v. *Board of Education, supra* at 7.

*Fourth:* An Act does not pursue a private purpose upon directing payments to individuals or enterprises in order to enforce a public program. ". . . Subsidies and loans to individuals such as farmers and home-owners, and to privately owned transportation systems, as well as many other kinds of businesses, have been commonplace practices in our state and national history." *Everson* v. *Board of Education, supra* at 7; *Carmichael* v. *Southern Coal Co., supra* at 518. A fortiori, the test applies more forcibly to a public enterprise.

*Fifth:* Although a tax can not be set aside merely because its purpose is new, there is no question that the tax whose objectives have been long continued by the government and the public is additionally evidenced. *Loan Association* v. *Topeka, supra* at 664–665; *Cincinnati Soap Co.* v. *United States, supra* at 314–315; *State* v. *Johnson,* 175 N.W. 589, 595–596 (Wis. 1919).

 Once these basic principles are established, the objections to the Act disappear. It seems obvious that the development of telecommunications and the support of a telephone and telegraph system constituted in the economic and social circumstances of 1945–47, and constitute nowadays,

an appropriation of funds for a public purpose. Indeed, it is surprising that at this stage such governmental power is questioned. On numerous occasions, both the Federal Supreme Court and other courts of appeal, have approved the assessment of taxes and the use of public funds for state activities practically identical to those above-mentioned. Some of the examples are as follows: manufacturing and marketing farm products, providing low-cost housing, creating a bank—*Green* v. *Frazier*, 253 U.S. 233 (1920) ; operation of a railroad—*Boston* v. *Jackson*, 260 U.S. 309 (1922) ; construction of a tunnel to lease it to a railroad, telegraph, electric power corporations, etc.—*Milheim* v. *Moffat Tunnel District, supra;* development of water resources for domestic uses, irrigation and electric power—*Gallardo* v. *Porto Rico Ry. Light and Power Co.*, 18 F.2d 918 (1 C.C.A. 1927) ; advertising campaign and exportation of coffee—*Márquez & Co.* v. *Sancho, Treas., supra;* advertising for an important industry—*C. V. Lloyd Fruit Co.* v. *Florida Citrus Commission*, 175 So. 248 (Fla. 1937).

And even in the area of municipal law, where by tradition the courts tend to be more strict, there are also numerous examples of the same attitude. *Jones* v. *City of Portland*, 245 U.S. 217 (1917)—yard for the sale of fuel; *Spangler* v. *City of Mitchell*, 152 N.W. 339 (S.D. 1915)—construction and operation of a telephone system; *Standard Oil Co.* v. *City of Lincoln*, 207 N.W. 172 (Neb. 1926) aff. in 275 U.S. 504 (1927)—sale of gasoline and oil; *City of Tombstone* v. *Macia*, 245 Pac. 677 (Ariz. 1926)—ice plant; *Bank* v. *Bell*, 217 Pac. 538 (1923)—market for the sale of foodstuff; *City of Frostburg* v. *Jenkins*, 136 A.2d 852 (Md. 1957)—construction of a building for private industry; *Mitchell* v. *City of Negaunee*, 71 N.W. 646 (Mich. 1897)—electric plant; *Turner* v. *City of Reidsville*, 29 S.E.2d 211 (N.C. 1944)—construction of an airport; *Albritton* v. *City of Winona*, 178 So. 799 (Miss. 1938), appeal dismissed,

303 U.S. 627 (1938)—construction of buildings for factories. See, Antieau, *Municipal Power to Tax—Its Constitutional Limitations*, 8 Vand. L. Rev. 698, 732–738 (1955).

If there should remain any doubt on these points it rapidly disappears when we consider that uninterruptedly from the beginning of the century [11] and up to the present and as revealed by the opinion of the trial court, the Puerto Rican government has maintained a telegraph and telephone communication system for which public funds have been appropriated for many millions of dollars. Service has been rendered during the administration of all the political parties and with the consent of all the governors. Only in a case of manifest diversion of public funds for a completely private use would there be justification to set aside judicially a governmental activity which has so often received the approval of the government and the people.

And again petitioner treads on the wrong path when it says that the Communications Authority is not "part of the government" nor exercises a "governmental function." It is the exclusive power of the legislature to determine what type of organization is best suited for the discharge of a public function. If the legislature prefers a board to a department or a public corporation to a bureau, that preference, except for constitutional provisions expressly prohibiting it, is conclusive for the courts.[12] The Legislature

---

[11] The first telegraph line in Puerto Rico was installed by Samuel F. Morse in 1849. At the end of the century the Spanish government operated a system of 41 stations, which was destroyed by a hurricane in 1899. The American military régime reconstructed the system and in 1901 transferred it to the insular government. It was put under the administration of the Commissioner of the Interior and extended to all the towns of the Island. On March 14, 1907 an Act was approved (Sess. Laws, p. 338), authorizing the Commissioner to construct and operate a system of long-distance and local telephone lines. It was not until 1914 that the petitioner received the franchise to establish the telephone system which it possesses today. See, Fernández García, *El Libro Azul de Puerto Rico* 702–12 (1923).

[12] Since *McCulloch v. Maryland*, 4 Wheat. 316, 421 (1819), the Federal Supreme Court recognized that Congress may create public corporations

of Puerto Rico, for reasons which it deemed sufficient, decided that as of 1942 the telegraph and telephone services rendered by the government should be assigned to a "public corporation and governmental instrumentality of The People of Puerto Rico" (Sess. Laws, p. 1064), which would have legal standing separate and apart from that of the government and officers who would operate it. As the trial court stated: "Suffice it to read the Act which created it to conclude that it is a public corporation that belongs to the community in general, that it operates for the exclusive benefit of the latter and not for any private interest and that it is an agency or vehicle through which the Puerto Rican government discharges certain public functions. The fact that it uses the corporative form for reasons of internal conveniences of an administrative character of the government, or for conveniences of a commercial character, does not alter its aforedescribed nature."

If we accept petitioner's contention we would place ourselves in the untenable position of deciding that up to 1942 the telegraph and telephone services were "part and function of the government" because they were under a bureau of the Department of Interior but that as of that date they ceased to be a "part and function of the government" because they were the responsibility of a public corporation entirely owned by the same government.[13]

In view of all the foregoing, we decide that the tax laid by Act No. 301 does not violate § 3 of the Organic Act.

---

to execute the powers granted to it, by the Constitution. As to Puerto Rico, see *People of Puerto Rico* v. *Eastern Sugar Assn.,* 156 F.2d 316, 325 (1946), *cert: denied,* 329 U.S. 772 (1946).

[13] Our decision on this question is limited to the constitutional problem causing it and should not be extended to other fields (liability for contracts or for damages, etc.), which are regulated by the pertinent legislative determinations. *Cf. Government of the Capital* v. *Executive Council, supra* at 432. The line of authorities cited by the petitioner in support of its contention refers specifically to these last problems.

## II. *Undue delegation of powers.*

■ Petitioner alleges that the Act challenged here leaves the proceeds of the tax to be expended "at the fancy of the Authority," that it does not fix standards to expend the tax and that for those reasons it constitutes an undue delegation of powers. We need not stop long on this point. As the trial court stated: "The Legislature levied the tax and determined its amount, chose the object as well as the subject thereof and fixed the purpose or use which it should be given. Henceforth, all the rest lies within the field of execution and implementation of the Act to enforce its purposes."

Even assuming, not free from doubt, *Cincinnati Soap Co.* v. *United States, supra* at 321–322, that the requirement of adequate standards applicable to the regulatory functions of the state are equally effective in the field of public expenditures, it is clear that the standards provided by Act No. 301 pass the constitutional test. Certainly, they are no less specific than that of "public interest, convenience, or necessity" approved in *NBC* v. *United States,* 319 U.S. 190 (1943), or that of "excessive profits" approved in *Lichter* v. *United States,* 334 U.S. 742 (1948), or that of "unfair methods of competition" approved in *Federal Trade Commission* v. *Gratz,* 253 U.S. 421 (1920). See also, *Yakus* v. *United States,* 321 U.S. 414 (1944); *United States* v. *Rock Royal Cooperatives,* 307 U.S. 533 (1939); 1 Davis, Administrative Law Treatise 81–87 (1959).

## III. *Exaction of petitioner's property, under the guise of taxing power.*

## IV. *Lack of uniformity and privation of property without due process of law.*

■ ■ We discuss these objections jointly because they actually constitute a single one. The petitioner briefly alleges that it alone, as a practical question, pays the tax and that the proceeds thereof have been spent for the "direct"

benefit of the inhabitants of Caguas and neighboring towns served by the Communications Authority. The inhabitants of the other towns are only benefited "indirectly" by the interconnection of the petitioner's system with that of the Authority in long distance calls. Furthermore, the petitioner "does not receive any particular benefit from the expenditure in which the tax has been involved, . . ." while "the majority of taxpayers has been exempt from paying any money to the special fund. . . ." For those reasons it maintains that the tax constitutes a binding exaction, violates the uniformity provision and deprives it of its property without due process of law. Let us examine the applicable considerations.

*First:* The problem of whether or not the petitioner can receive "direct" benefits from the fund established by § 2 of Act No. 301 is not primarily raised in this proceeding. Besides, it is unnecessary to decide it because the pertinent constitutional standards are not based on the determination of that fact.[14] It is well to indicate, however, that although in the years mentioned in this suit only the Authority received money from said fund, the evidence shows that the petitioner never requested appropriations nor that part of the money be assigned for "experiments or investigations" benefiting it directly. Besides, it is somewhat euphemistic to label "indirect" the benefits admittedly received by the petitioner from long distance calls to the towns served by the Authority, where, as the evidence showed, by the use of money from the special fund and from substantial appropriations of general funds, the number of subscribers has multiplied and the service has been extended and markedly improved.

---

[14] As shown in the record, the officers of the Authority believe that they cannot make improvements on the territory served by the Porto Rico Telephone Co. That determination, of course, is not binding on the petitioner nor on the courts and must be elucidated in a proper judicial proceeding.

■ *Second:* A tax is in no way unconstitutional merely because the expenditure of its product does not benefit those who pay it.[15] "Nothing is more familiar in taxation than the imposition of a tax upon a class or upon individuals who enjoy no direct benefit from its expenditure, and who are not responsible for the condition to be remedied.

"A tax is not an assessment of benefits. It is, as we have said, a means of distributing the burden of the cost of government. The only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good. A corporation cannot object to the use of the taxes which it pays for the maintenance of schools because it has no children. This Court has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public moneys to be apportioned to the burdens of the taxpayer, or that he can resist the payment of the tax because it is not expended for purposes which are peculiarly beneficial to him." *Carmichael* v. *Southern Coal Co., supra* at 521–523. See, also, *Rapid Transit Corp.* v. *New York,* 303 U.S. 573, 584–587 (1938) ; *Magnano Co.* v. *Hamilton, supra* at 43.

■ *Third:* The petitioner does not affirm, nor is it in a position to affirm, that the tax of Act No. 301 infringes the due process and equal protection of the laws merely because it applies exclusively to the telephone and telegraph com-

---

[15] Nor is it, of course, *merely* because it restricts or destroys certain occupations or businesses. *Magnano Co.* v. *Hamilton, supra* at 44–47; Cushman, *Social and Economic Control Through Federal Taxation,* 18 Minn. L. Rev. 757, 763–764 (1934).

panies operating in Puerto Rico. In view of the wide legislative authority to establish reasonable classifications for the assessment of taxes, the classification previously described is neither arbitrary nor oppressive or capricious. *Citizens' Telephone Co.* v. *Fuller*, 229 U.S. 322 (1913); *Nashville C. & St. L. Ry.* v. *Browning*, 310 U.S. 362, 368 (1940); *Steward Machine Co.* v. *Davis*, 301 U.S. 548, 584 (1937); *Rapid Transit Corp.* v. *NewYork*, *supra* at 578–581; *Carmichael* v. *Southern Coal Co.*, *supra* at 509; *Walters* v. *City of St. Louis*, 347 U.S. 231, 237 (1954); *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F.2d 96, 100. (C.C.A. 1st 1946). And it is obvious that "the provisions of the legislation earmarking the funds collected are not of importance in determining whether or not the classification of the challenged acts is discriminatory." *Rapid Transit Corp.* v. *New York*, *supra* at 587.

The legislative discretion is not reduced because the class described in the Act, as a question of fact, includes only one taxpayer. The public service enterprises—especially telephone, telegraph, electricity, water, and some transportation enterprises—are usually found in that position. For well-known reasons, the state very frequently grants to those enterprises the monopoly of the service in specific areas, subject, as we know, to a detailed regulation of their activities. The granting of that monopoly does not bar the state, however, from levying special taxes for the privilege granted or from including them reasonably within a particular class of taxpayers. The opposite would mean that the enterprise had acquired, together with the monopoly, a tax exemption on the privilege of its franchise and on its business activities and that the state could not impose thereon any special tax but only those taxes of a general type—income, property, excises—which all other taxpayers pay. That theory has been repeatedly rejected by the Federal Supreme Court. *Puget Sound Co.* v. *Seattle*, *supra*

at 627; *cf. Rapid Transit Corp.* v. *New York, supra* at 588–596.

 *Fourth:* The judgments of the Federal Supreme Court "leave no doubt that a state may, in the public interest, constitutionally engage in a business commonly carried on by private enterprise, levy a tax to support it, . . . and compete with private interests engaged in a like activity." *Puget Sound Co.* v. *Seattle, supra* at 624; Smith, *Constitutional Limitation on Sovereign Competition,* 13 Temple L. Q. 415, 457–458 (1939).

 *Fifth:* The rule of uniformity of taxation incorporated into the Organic Act requires, like the federal provision, geographical and not intrinsic uniformity—*Steward Machine Co.* v. *Davis, supra* at 583; *South Porto Rico Sugar Co.* v. *Buscaglia, supra* at 100; *Rullán* v. *Buscaglia,* 168 F.2d 401, 403 (C.C.A. 1st 1948)—and it is obvious that it is not violated in the case at bar. How the product of the tax is spent bears no relation to that rule either. This is something that belongs to the determination of whether or not the tax is for a "public purpose." And, of course, the fact that a group of citizens is more benefited than others by an improvement or public service is not, as we have already seen, in itself a sign that the tax expended in such improvement or service is not for a "public purpose."[16] We are surrounded by hundreds of public works and services which because of the physical fact of their location benefit some citizens more "directly" than others. It would be impossible to administer the public funds if the opposite rule were adopted.

Once it is established that the tax is for a "public purpose" and that the taxing classification is valid and complies with the rule of geographical uniformity, we must uphold its constitutionality even where the expenditure of

---

[16] The same rule prevails in condemnation of property for "public use." *Rindge Co.* v. *Los Angeles,* 262 U.S. 700 (1923); *Mt. Vernon Cotton Co.* v. *Alabama Power Co.,* 240 U.S. 30, 32 (1916).

its product benefits some citizens more than others and not at all, if such were the case here, the taxpayer who pays it.

V. *The Act is void because it prohibits passing the tax to the consumer.*

The petitioner maintains that the provision of Act No. 301 which prohibits charging the tax to the persons using the telephone and telegraph services is void "because he who sells commercial articles cannot be constitutionally forced to absorb ultimately the burden of a tax, which is an expense, and be prohibited from recovering it in any way whatever."

The trial court decided correctly that the said prohibition of the Act applies in practice only to the Communications Authority because the latter is the only one authorized to fix its rates without the intervention of any other official body. The petitioner, on the contrary, cannot increase its rates without the approval of the Public Service Commission. We have to accept, of course, that the Legislature knew that basic fact. We must equally accept, as did the trial court, that the Legislature knew at the time of approving Act No. 301, that the petitioner was entitled, as a constitutional and legal right, to obtain reasonable profits from its enterprise and that it did not try to prevent that the tax of Act No. 301 be taken into consideration in the determination of its rates. *Galveston Electric Co.* v. *City of Galveston*, 258 U.S. 388, 399 (1922) ; *Georgia Railway and Power Co.* v. *Railroad Commission*, 262 U.S. 625 633 (1923). Consequently, it was before the Public Service Commission that the petitioner had to raise, in the first instance, the effects of the new tax, in a petition for rate increase.[17] It could have done this as soon as Act No. 301 went into effect, and since the tax is paid annually, it would have had ample

---

[17] Petitioner points out that the practice of public service commissions in the United States is to authorize enterprises "to charge the tax in the monthly bills directly to its clients as a surcharge . . . and not to open rate proceedings each time a new tax arises." It affirms that Act

opportunity to recover it if the Commission would have granted the necessary authority. However, the petitioner chose to wait until 1949, to apply for an increase. That petition, as we saw in the statement of facts proven, was due to considerable increases in wages and other employment conditions which the petitioner made to its employees during several years. The only conclusion which arises from those facts is that the Porto Rico Telephone Co., by reasons which it deemed good, decided that the increase in its expenses caused by the tax of Act No. 301 was not sufficient reason to apply to the Commission for a rate increase. Having made that decision, the petitioner cannot now adduce, as a ground for unconstitutionality, that Act No. 301 forbade it to pass the tax to the consumers of the service.

It is also well to clarify that the legislative prohibition of passing a tax to the consumer is not in itself and in all circumstances, ground for unconstitutionality. *Rapid Transit Corp.* v. *New York, supra* at 581–582; *Southern Boulevard R. Co.* v. *City of New York*, 86 F.2d 633, 637 (C.C.A. 2d) (1936) *cert. denied*, 301 U.S. 703 (1937). Our decision in *Pyramid Products* v. *Buscaglia, Treas.*, 64 P.R.R. 788, 809 (1945), main precedent cited by the petitioner, is based on the retroactivity of the tax. That circumstance is not present in the case at bar.

For the reasons stated in this opinion, we decide that § 2 of Act No. 301 of May 15, 1945 is constitutional in the light of the applicable provisions of the Organic Act of 1917, as well as of those of the Federal Constitution.

The judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Santana did not participate herein.

---

No. 301 prohibits this procedure. Aside from the fact that the petitioner is actually complaining that something which it did not request might be denied, we do not believe that Act No. 301 in itself constitutes an obstacle for the aforesaid procedure, provided the latter is authorized by our public service laws.